<u>AFFIDAVIT IN SUPPORT OF</u>
<u>AN APPLICATION FOR A SEARCH WARRANT</u>

I, Jeffrey J. Hale, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic investigative technique further described in Attachment B, in order to identify the cellular devices carried by LOUIS PEREZ III (the "Target Cellular Devices"), described in Attachment A.

2.      I am a state certified law enforcement officer employed as a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation (DCI) and have been a sworn officer in the State of Wisconsin for approximately 24 years.  I am currently assigned to the North Central High Intensity Drug Trafficking Area (HIDTA) Heroin Task Force.  I am also a federally deputized Task Force Officer with the United States Department of Justice, Drug Enforcement Administration (DEA).  As such, I am in an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

3.      I have participated in numerous complex narcotics investigations that involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b)

1

and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses. I have had both formal training and have participated in numerous complex drug trafficking investigations, including ones using wiretaps. More specifically, my training and experience includes the following:

> a. I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

> b. I have also relied upon informants to obtain controlled substances from dealers, and have made undercover purchases of controlled substances;

> c. I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

> d. I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base, ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

e.     I am familiar with the language used over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

f.     I know that drug traffickers often use electronic equipment and wireless and land line telephones to conduct drug trafficking operations;

g.     I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

h.     I have been assigned to court-authorized wiretaps and have been trained to operate the equipment used to conduct such operations;

i.     I know that drug traffickers often put their telephones in nominee names to distance themselves from telephones that are used to facilitate drug trafficking; and

j.     I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement officials.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3

5.      This Court has authority to issue the requested warrant under Federal Rule of Criminal Procedure Rule 41(b)(1) & (2) because the Target Cellular Devices are currently believed to be located inside this district because LOUIS PEREZ III is currently known to spend most of his time in this district, and he was seen in the Eastern District of Wisconsin as recently as April 7, 2020. Pursuant to Rule 41(b)(2), law enforcement may use the technique described in Attachment B outside the district provided the devices are within the district when the warrant is issued.

6.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(l) and 846 (distribution of controlled substances and conspiracy to distribute controlled substances); 21 U.S.C. § 843(b) (unlawful use of communications facilities); and 18 U.S.C. §§ 1956 and 1957 (laundering of monetary instruments and conspiracy to do so) have been committed, are being committed, and will be committed by LOUIS PEREZ III, XINA YANG, LOUIS PEREZ JR., and others yet unknown.  There is also probable cause to believe that the identity of the Target Cellular Devices will constitute evidence of those criminal violations.  In addition, in order to obtain additional evidence relating to the Target Cellular Devices, their users, and the criminal violations under investigation, law enforcement must first identify the Target Cellular Devices.  There is probable cause to believe that the use of the investigative technique described by the warrant will result in officers learning that identifying information.

4

7.      Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41. *See* 18 U.S.C. §§ 3121-3127. This warrant therefore includes all the information required to be included in a pen register order. *See* 18 U.S.C. § 3123(b)(1).

## PROBABLE CAUSE

8.      In September 2018, HIDTA DEA initiated an investigation into individuals distributing large quantities of cocaine and marijuana throughout Milwaukee, Wisconsin. HIDTA identified the individual orchestrating the DTO as LOUIS R. PEREZ III (PEREZ III). The investigation has revealed that PEREZ III obtains large quantities of cocaine, heroin, and marijuana from unknown source(s)-of-supply in or near California, and from the Milwaukee, Wisconsin area, which is then distributed in the Milwaukee area. To date, the investigation has also revealed the following:

        a.      The DTO uses couriers to bring cocaine from the west coast of the United States to Milwaukee, Wisconsin, and money from Milwaukee to the west coast;

        b.      XINA YANG (XINA) and others, are facilitating the PEREZ III DTO by regularly making travel, lodging, and other arrangements for the DTO and by financially assisting the DTO;

5

c.     Pursuant to a Wisconsin Department of Workforce Development query for the years 2018 and 2019, PEREZ III has no legitimate employment record. This is consistent with the daily positional data on his phones.[1]  However, bank account records from 2017 through 2019 for PEREZ III and XINA reflect frequent and often high-level cash deposits and withdrawals in geographically disparate areas to include Milwaukee and California locations, and are consistently travel-related. Travel records, bank account information, and telephone location data reflect that PEREZ III and XINA frequently travel between Milwaukee, Wisconsin and California, particularly the northern California and Los Angeles, California areas. The northern California areas in which PEREZ III and XINA appear to frequent based upon positional data from their telephones are areas that are known by law enforcement to be the location of large-scale marijuana grow and distribution operations;

d.     In ▮▮▮▮▮▮▮▮▮▮ pursuant to an order authorized in ▮▮▮▮▮▮▮▮▮▮ PEREZ III was intercepted engaging in drug-related communications with a source of information (SOI #1). SOI #1, upon arrest, admitted to supplying PEREZ III with kilogram quantities of cocaine throughout 2018 and 2019. SOI #1 described SOI #1 as a "back up supplier" to PEREZ III; and

[1] The only known social security number for XINA returns results for MARY YANG, XINA's sister, when queried with the Wisconsin Department of Workforce Development. However, XINA has never been surveilled traveling to or from work, and the daily positional data of her phones is inconsistent with any legitimate employment.

6

e.     Since December 2019, PEREZ III has been shipping parcels to JULIAN SANCHEZ (SANCHEZ) in California using aliases and sender addresses not associated with PEREZ III. This has been confirmed by positional data and U.S. Postal Service video surveillance.

9.     Special Agents of HIDTA and DEA have received information concerning the illegal drug trafficking activities of members of the DTO.

a.     Beginning in ███████████████ a source of information (SOI #1) made statements against SOI #1's penal interest. ████████████████
████████████████████████████ Redacted

Redacted

Redacted ██████

██████████████████████████████

██████ Thus far, the information provided by SOI #1 has been corroborated by information known to case agents gathered during the course of this investigation. According to law enforcement databases ████████████████
██████ Within the context of the information detailed and relied upon for purposes of this application, law enforcement believes that SOI #1 is credible and SOI #1's information is reliable.

b.     In December 2019, SOI #2 provided information against SOI #2's penal interest. ███████████████████████ Redacted
██████████████████████████ SOI #2 has never been paid money in exchange for his cooperation with law enforcement.  Thus far, the

7

information provided by SOI #2 has been corroborated by other information gathered during the course of the investigation. According to law enforcement databases, ███████████ Redacted ███████████ Redacted ████████████

███████████████████████ Redacted ████████████████████

████████████████████ Redacted ████████████████████

███████ Redacted ███████████. Within the context of the information detailed and relied upon for purposes of this application, law enforcement believes SOI #2 is credible and SOI #2's information is reliable.

>    **A.    Eight Kilograms of Cocaine Seized from PEREZ JR. While Driving From California to Wisconsin; PEREZ III Dropped His Telephone Number.**

10.    On September 25, 2018, at approximately 2:47 a.m., a trooper with the Utah Highway Patrol observed a silver Ford F-150, bearing Wisconsin registration plate PE6037, traveling north on I-15. The trooper observed that the truck was traveling near a Chevrolet Suburban with California registration plates. Upon stopping the Ford F-150 because the registration plate did not return to the vehicle, the trooper identified the driver of the Ford F-150 as PEREZ JR. Almost immediately after the stop, PEREZ JR.'s cellphone began to ring. PEREZ JR. answered the phone and explained that he had been stopped for the vehicle registration. PEREZ JR. informed the trooper that he was traveling with his son, later determined to be PEREZ III.

11.    PEREZ JR. appeared very nervous. PEREZ JR. stated that he had purchased the truck in Wisconsin, and that he and his son, who was traveling with

8

his girlfriend, drove separate vehicles to Las Vegas. He further gave the name of two different hotels where they had stayed in Las Vegas. The trooper asked PEREZ JR. if he had asked his son to wait for him at the next exit, and PEREZ JR. stated that he had. Additionally, PEREZ JR. stated that his son had a place in California, but lived in Milwaukee.

12. The trooper asked PEREZ JR. if there was anything illegal in the F-150, and PEREZ JR. stated that there was not. The K-9 alerted on the vehicle and PEREZ JR. gave officers on scene consent to search the F-150. A subsequent search of the F-150 revealed a hidden hydraulic compartment in the rear seat area of the F-150 containing eight packages of cocaine wrapped in plastic wrap, totaling eight kilograms. Also located in the Ford F-150 were two cellular telephones, later determined to be cellular telephone numbers (414) 208-8352 and (213) 423-9135, and a receipt showing the purchase of the phone with assigned number (213) 423-9135, a prepaid phone, on September 21, 2018, under the subscriber name of Ricardo Torro in Los Angeles, California.

13. On September 25, 2018, PEREZ JR. was arrested for Possession with Intent to Deliver Cocaine, and PEREZ JR. provided the following in a Mirandized interview:

a. PEREZ JR. stated that he left Wisconsin on September 20, 2018, because he wanted to visit California as a tourist. He now stated that he did not go to Las Vegas.

9

b.    PEREZ JR. stated that he stayed in his truck, which he recently purchased, at rest stops, and that he stayed in hotels once in California. PEREZ JR. gave different hotel names before committing to staying at the Best Western Hotel in Indio, California.

c.    PEREZ JR. stated that his son and his son's girlfriend, XINA, traveled from Milwaukee to California with him in the Ford F-150, but that his son and XINA rented a truck in California because they did not want to make the return trip to Milwaukee "inconvenient" for PEREZ JR. PEREZ JR. confirmed that PEREZ III and XINA were operating the truck traveling in close proximity to PEREZ JR. when he was stopped.

d.    PEREZ JR. stated that he did not know anything about the kilograms of cocaine contained in the hidden compartment in his truck. PEREZ JR. further stated that PEREZ III used his truck briefly while in California, but denied knowing where PEREZ III went.  PEREZ JR. stated that PEREZ III arranged for PEREZ JR. to purchase the truck.

e.    Regarding the MetroPCS prepaid cellular telephone located in his vehicle, PEREZ JR. stated that he did not know Ricardo Torro (subscriber); that PEREZ III purchased the phone while in California; and, that he only used that phone for the GPS feature on the phone while traveling. PEREZ JR. stated that the other phone located in the truck was his "personal" phone.

10

14.     On December 12, 2018, PEREZ JR. was indicted in the District of Utah for Possession with Intent to Distribute Cocaine. He was subsequently arrested on December 21, 2018, at his residence, 420 E. Morgan Avenue, Milwaukee, Wisconsin.

15.     During a *Mirandized* interview on December 21, 2018, PEREZ JR. confirmed that he traveled to California with PEREZ III and XINA in his truck, but they rented a black Suburban for the drive back to Wisconsin and were following PEREZ JR. when he was stopped. PEREZ JR. stated that nobody used his truck while in California, contrary to his statement upon his arrest in Utah, and that he did not know what PEREZ III and XINA did while in California. PEREZ JR. stated that he stayed in a hotel for five nights in California but did not leave the room except for at night because it was "too hot" outside.

16.     Records from Best Western Hotel in Indio, California revealed that, on September 21, 2018, XINA rented rooms 107-A and 110-A and paid for both rooms through September 25, 2018. XINA provided an address of 420 E. Morgan Avenue, Milwaukee, Wisconsin. A portion of both room charges were paid for in cash and the remaining balance was paid with a credit card. Copies of the room rental agreements for both rooms have the signature that appears to be PEREZ III, as the signature has a distinctive "L" and "P," along with the numerals "III" behind the signature.

17.     On September 25, 2018, Wells Fargo bank records further revealed a $2,000 deposit into XINA's Wells Fargo bank account at a branch in Saint George, Utah. The bank records also have a copy of a deposit slip bearing the name XINA

11

for this deposit, as well as a photograph of the top portion of the face of an Asian female.

18.     Furthermore, American Airlines flight records confirm that, on September 25, 2018, PEREZ JR., PEREZ III, and XINA flew American Airlines flight 296 departing from Los Angeles International Airport at 11:53 p.m. and arrived at Chicago O'Hare Airport at 6:00 a.m. on September 26, 2018. XINA booked the flights using her email address (ladie.macc@gmail.com), and paid for the flights using her Wells Fargo Bank debit card. Case agents are aware that on September 25, 2018, after PEREZ JR. had been interviewed by law enforcement in Utah, he was released on bail.

19.     Based on my training, experience, and knowledge of this investigation, I believe that PEREZ III and XINA owned the eight kilograms of cocaine seized on September 25, 2018 in Utah. I further believe that this seizure evidences that the PEREZ III DTO is transporting kilogram quantities of cocaine from California to Wisconsin.

20.     A review of the telephone download of PEREZ JR.'s MetroPCS prepaid cellular telephone revealed that the only listed contact was "L," with a phone number of 213-433-9490, which was also a prepaid cellular telephone activated on September 21, 2018, in the name of an unknown individual in Los Angeles, California.  PEREZ JR.'s telephone download further revealed both incoming and outgoing text messages and telephone calls between these prepaid phones from September 21, 2019 through September 25, 2019, the date of the traffic stop. Based

12

upon the above, I believe that "L" stands for LOUIS (PEREZ III), and that PEREZ III and PEREZ JR. were using the two prepaid phones to communicate while they were driving in separate vehicles back to Wisconsin.

21.     A review of positional data obtained pursuant to a search warrant revealed that the prepaid cellular telephones operated by PEREZ JR., PEREZ III, and XINA were traveling in the same general areas at the same general times from September 21, 2018 to September 25, 2018, which reflects that they were all in the same general area at the same general time.

22.     At the time of the Utah traffic stop, PEREZ III was using an additional phone number, (414) 336-8443, which was activated on July 26, 2017, and subscribed to by LOUIS R. PEREZ, at 2923 S. 6th Street, Milwaukee, Wisconsin. The day after the Utah traffic stop, or September 26, 2018, PEREZ III cancelled this cellular telephone number and established a new phone number: (262) 402-9497.

**B.     $99,970 Seized From MARY YANG While Driving From Milwaukee To California; PEREZ III Uses A Predecessor Phone to Contact MARY YANG.**

23.     On August 28, 2019, at approximately 4:24 p.m., a Wyoming Highway Patrol Trooper stopped a red Dodge Grand Caravan bearing Wisconsin Registration AGB3074 traveling westbound on I-80 for speeding. Located inside the vehicle was MARY YANG (MARY), the driver, three children, and three dogs inside a dog kennel. MARY is XINA's sister. MARY stated that the minivan was rented, and the trooper detected a strong odor of marijuana emanating from the interior of the van.

13

24.     While seated in the trooper's vehicle, MARY stated that (1) she was driving from Milwaukee, Wisconsin, to Fresno, California, to visit her mother and planned to stay for two days before returning home; (2) she rented the van on Monday, August 26, 2019, and planned to return it on September 3 or 4; and (3) two of the children in the van were hers and one was her niece.

25.     Then, in a Mirandized interview, MARY stated that she had a small amount of personal marijuana in her van and approximately $4,000 in U.S. Currency in the vehicle.

26.     After a narcotics detection canine indicated on the passenger side of the van, the trooper searched it, located two partially burned marijuana cigarettes in the center console, marijuana "shake" on the front passenger seat, $4,000 in a fanny pack, and nine bundles of suspected bulk currency, totaling $99,970 in the driver's side stow-n-go compartment under the dog kennel. The bundles were tightly wrapped in black electrical tape. MARY denied any knowledge of the nine bundles of currency, but claimed ownership of the currency in the fanny pack.  MARY was arrested for possession of marijuana.

27.     At the time of the stop, MARY possessed a cellular telephone, determined to be telephone number (414) 607-2576, and MARY stated that she lived at 4748 N. 49th Street, Milwaukee, Wisconsin.

28.     A toll analysis revealed that PEREZ III, using predecessor phone number (213) 238-1605, was in contact with MARY's telephone number (414) 607-2576 eight times on August 28, 2019. XINA, also using a predecessor phone

14

number, was in contact with MARY's telephone 87 times between August 26 and September 3, 2019.

29.    Within the lawful forensic download of MARY's cellular telephone, case agents located several text messages between MARY and XINA's predecessor phone number beginning on August 26, 2019, that discussed the rental of the van and XINA asking MARY if MARY took the cost of the van "out of my money."

30.    On September 25, 2019, PEREZ III's predecessor phone number (213) 238-1605 and XINA's predecessor phone number—both numbers used to contact MARY the day she was stopped—were no longer used to make outgoing calls. Based on a common call analysis using pen/trap data, agents identified (626) 733-2083 as the replacement phone number for PEREZ III, and (626) 629-6224 as the replacement phone number for XINA. Both phones were activated on September 24, 2019 and subscribed to by LOUIS R. PEREZ, 420 E. Morgan Avenue, Milwaukee, Wisconsin.

**C.    DTO Expenditures.**

31.    Based on the investigation to date, I believe that the PEREZ III DTO principally operates in cash. Case agents have examined bank records for PEREZ III, XINA, and others dating back to January of 2017, as well as flight records for PEREZ III, XINA, and others. This analysis has revealed that between January 27, 2017 and November 6, 2018, a total of $83,800 was deposited into XINA's Wells Fargo bank account ending in x3243, comprised of $71,000 cash and $9,961 in two federal tax refunds. The cash deposits occurred in various cities throughout the

15

United States, including Milwaukee, Wisconsin; Davenport and Miami, Florida; St. George, Utah; and Santa Rosa, California. During this same time-frame, withdrawals from this account totaled $83,772. Further, between April 1, 2019 and November 6, 2019, a total of $50,800 was deposited into XINA's U.S. Bank account ending in x3919, comprised of $38,000 cash and the remainder being PayPal credits and transfers from other bank accounts. The cash deposits occurred in Milwaukee, Wisconsin; and Redding, Palm Springs, and Vallejo, California. The total withdrawals from this account totaled $50,300.

32.     The cash deposits and withdrawals reflected are also significant for the following reasons:

a.     XINA's and PEREZ III's cash deposits and withdrawals occur in both Milwaukee and various cities in California, thus evidencing PEREZ III's and XINA's activities in furtherance of the DTO;

b.     Activity on PEREZ III's and XINA's accounts happens at branch locations in California when flight records place them in Wisconsin and vice versa. Additionally, in some instances financial activity will occur at branch locations in Wisconsin and California on the same day. For example:

i.     On April 16, 2018, there was a $5,000 withdrawal from XINA'S Wells Fargo account at a Wells Fargo branch located in Santa Rosa, California. The same day there was a $5,000 deposit into XINA's Wells Fargo account at a Wells Fargo branch located in Milwaukee, Wisconsin.

16

ii.    On March 12, 2018, there was a $300 withdrawal from XINA's Wells Fargo account at the Wells Fargo branch at 200 B Street, Santa Rosa, California. The same day there was an additional $5,000 withdrawal from the same account at the same branch location. The same day there was an additional $5,000 withdrawal at the Wells Fargo branch located at 2751 4th Street, Santa Rosa, California. The same day, there was a $5,487 deposit into XINA's Wells Fargo account at the Wells Fargo branch located at 131 W. Layton Avenue, Milwaukee, Wisconsin. There was an additional deposit that day in the amount of $7,020 into XINA's Wells Fargo account at the Wells Fargo branch located at 6130 W. National Avenue, Milwaukee, Wisconsin. This is indicative of an unknown person using XINA's account in furtherance of the DTO.

iii.    On April 20, 2018, PEREZ III opened a Wells Fargo account ending in x9363 at the Wells Fargo branch located in Healdsburg, California. Between April 20 and April 23, 2018, a total of $13,275 was deposited in this account in Milwaukee, Wisconsin. Between April 23 and April 24, 2018, all $13,275 had been withdrawn in Santa Rosa, California. XINA's Wells Fargo account reflects similar activity during this time period.

c.    The deposit and withdrawal activity often corresponds with flight activity of various individuals believed to be co-conspirators. For example:

i.    On January 6, 2017, there was an $860 cash deposit into JASMINE PEREZ's TCF Bank Account. JASMINE PEREZ (JASMINE) is PEREZ III's sister. Also on January 6, 2017, PEREZ III and Esteben Reyes flew from

17

Mitchell International Airport in Milwaukee, Wisconsin, to Sacramento International Airport in Sacramento, California, on American Airlines. The flights, totaling $1,413.11, were paid for with a TCF Bank card belonging to JASMINE. PEREZ III returned to Milwaukee two days after departing Milwaukee, Wisconsin. The short turnaround time is consistent with travel in furtherance of the DTO.

        ii.     On July 14, 2017, PEREZ III, XINA, and Jose Guerrero flew from O'Hare International Airport to San Francisco International Airport. PEREZ III paid for all of the flights with his U.S. Bank debit card. That same day, there was a $4,400 cash deposit into XINA's Wells Fargo account. This deposit was made at the Wells Fargo branch in Milwaukee, Wisconsin. On July 16, 2017, PEREZ III and XINA flew from San Francisco International Airport to O'Hare International Airport. The flights were paid for in cash, and $7,500 was withdrawn from XINA's account the following day.

        iii.     On August 11, 2017, there was a cash deposit of $8,524 into XINA's Wells Fargo account at the Wells Fargo branch located at 7600 W. Hampton Avenue, Milwaukee, Wisconsin. On August 12, 2017, PEREZ III flew from O'Hare International Airport to San Francisco International Airport on American Airlines. The flight was paid for from XINA's Wells Fargo Bank account.

        d.     Some transactions have been structured. As evidence of this, on July 17, 2017, the day after PEREZ III and XINA flew from San Francisco International Airport to O'Hare International Airport, three separate withdrawals,

Case 2:20-mj-00931-NJ   Filed 04/09/20   Page 18 of 41   Document 1-1

each for $2,500, from XINA's Wells Fargo account occurred at three separate California Wells Fargo branch locations.

33. Despite frequent travel to California and numerous cash deposits in their bank accounts, to date, case agents have been unable to identify any legitimately earned income on behalf of either PEREZ III or XINA.

34. Financial documents have revealed the following about PEREZ JR.

a. On May 8, 2017, a bank account owned by Sunrise Cleaning Services, a business owned by PEREZ JR., incurred expenses at several gas stations in Iowa, Nebraska, and Colorado. It is case agents' belief that PEREZ JR. was driving to or from somewhere in the western United States in furtherance of the DTO.

b. On September 28, 2018, there was a $5,000 cash deposit into PEREZ JR.'s Sunrise Cleaning Service bank account. On October 1, 2018, PEREZ JR.'s Sunrise Cleaning Service U.S. bank account showed a $5,000 payment to a law firm. On October 9, 2018, there was a $2,500 cash deposit into PEREZ JR.'s Sunrise Cleaning Service bank account. On October 10, 2018, PEREZ JR.'s Sunrise Cleaning Service bank account showed a $2,500 payment to a law firm. I believe that someone provided cash to PEREZ JR. to pay for PEREZ JR.'s lawyer fees associated with his pending case in Utah.

35. Financial documents have revealed the following about JASMINE:

a. On September 25, 2018 (the day that PEREZ JR. was stopped in Utah) $7,616 in U.S. Currency was deposited into JASMINE's TCF bank account in

19

Milwaukee, Wisconsin. On September 26, 2018, JASMINE's TCF Bank account showed a $1,336 payment to Davidson Bonding LLC in Utah. There was an additional $6,180.00 payment to AAA Bail Bonds in Utah paid from the same account.

b.   On February 20, 2019, JASMINE received a deposit of $1,215 from Square Inc. into her Wells Fargo account. The same day, (1) there was a withdrawal of $800 in cash from the Wells Fargo branch located in Vallejo, California, and (2) JAMSINE's Wells Fargo account sent $240 to SANCHEZ.

c.   On March 1, 2019, there was a $2,000 cash withdrawal from JASMINE's Wells Fargo account in Milwaukee, Wisconsin. The same day, JASMINE accessed her safety deposit box, which she opened at Wells Fargo on February 2, 2019.

36.   JASMINE received deposits from Square Inc. into her Wells Fargo account on various dates between February 27, 2019 and May 20, 2019 in amounts from $45 and up to $2,175. She accessed her Wells Fargo safety deposit box on May 20, 2019.

37.   Flights records further establish the following:

a.   On October 31, 2018, PEREZ III and SANCHEZ flew from O'Hare International Airport to Los Angeles International Airport. PEREZ III paid for both flights from his U.S. Bank account;

b.   On November 11, 2018, PEREZ III and SANCHEZ flew American Airlines from Los Angeles International Airport to O'Hare International

20

Airport. The cost of the flights were $586.04 each and were paid for from XINA's Wells Fargo account.

### D. DTO Travel and Surveillance of DTO Activities.

38. Positional data for predecessor telephone numbers associated with PEREZ III and XINA, for various times between June 2019 and January 2020, revealed that PEREZ III and XINA frequently traveled between Wisconsin and California, and between Los Angeles, Vallejo, and northern California. Public databases revealed that XINA was associated with the address of 24 Rose Lane, Vallejo, California. Pacific Gas and Electric records indicate that XINA was the utility subscriber for 24 Rose Lane, Vallejo, California from May 11, 2018 to September 30, 2019. Based upon their pattern of travel to northern California, which is the hub of marijuana grows, use of unexplained cash, and SOI information, I believe that PEREZ III's and XINA's marijuana source of supply is located in the northern California area, and they travel to this area in furtherance of the DTO.

39. For example, positional data on PEREZ III's and XINA's predecessor phones revealed that the phones traveled to Los Angeles, California on June 17 and 18, 2019. On June 19 and 20, both phones traveled approximately 405 miles north from Los Angeles to Vallejo, California. On June 26, 2019, PEREZ III's predecessor phone traveled to Perris, California (southeast of Los Angeles) and back to Vallejo on June 28, 2019. On July 2, 2019, both phones traveled north to various areas near Redding, California, and then back to Vallejo. On July 3, 2019, both phones traveled to Illinois near O'Hare airport, then to Milwaukee, Wisconsin.

40.     Two days later, on July 5, 2019, at approximately 9:25 a.m., case agents observed a white Dodge minivan bearing California registration 8GRU235 parked in the driveway at 722 S. 25th Street, Milwaukee, Wisconsin. The white Dodge minivan was registered to EAN Holdings, LLC, a rental car company, whose records indicated that the vehicle was rented by Kao Yang, XINA's mother, in Fresno, California, on June 29, 2019. The vehicle was scheduled to be returned on July 6, 2019, but the return date was changed to July 13, 2019. Positional data for PEREZ III's and XINA's predecessor telephones established that both were in the vicinity of 722 S. 25th Street, Milwaukee, Wisconsin, on July 5, 2019, and at approximately 5:20 p.m. on July 5, 2019, case agents observed PEREZ III wearing a brown leather backpack, emerge from the driveway area of the residence and walk up to the front door of the residence.

41.     PEREZ III and XINA took a similar trip from July 8-17, 2019. Their predecessor phones registered first near O'Hare airport in Illinois, then San Francisco airport, before traveling and arriving in Vallejo, California, on July 9, 2019. On July 10 and 11, 2019, PEREZ III's predecessor phone traveled to various areas in Northern California and Vallejo, before both phones registered in Los Angeles from July 12-14, 2019. Both phones then traveled north to Redding on July 15, Vallejo on July 16, and Milwaukee on July 17, 2019.

42.     On August 6, 2019, PEREZ III and XINA's predecessor phones began traveling west. The travel pattern of the phones reflected that PEREZ III and XINA were traveling in a vehicle. On August 8, 2019, the phones began pinging in the

22

area of 24 Rose Lane, Vallejo, California. Both phones continued to register in California until August 16, 2019 when they both registered in Chicago, Illinois, near O'Hare airport, and then Milwaukee, Wisconsin.

43.     On September 2, 2019, PEREZ III's and XINA's predecessor phones again began traveling west and reflect that PEREZ III and XINA were traveling in a vehicle. On September 4, 2019, both phones registered in the area of 24 Rose Lane, Vallejo, California.

44.     On November 1, 2019, at approximately 7:27 p.m., PEREZ III's and XINA's predecessor phones began traveling east from Vallejo, California, along I-80. The phones subsequently registered in Nevada (November 2, 2019, at approximately 3:15 p.m.), Utah (November 2, 2019, at approximately 6:34 p.m.), Wyoming (November 3, 2019, at approximately 12:45 a.m.), Nebraska (November 3, 2019, at approximately 7:10 p.m.), and Stuart, Iowa (November 4, 2019, at approximately 2:53 a.m.).

45.     On November 4, 2019, at approximately 2:04 a.m., XINA's predecessor phone made an outgoing call to the Stuart Motor Lodge, a motel located at 203 SW 7th Street, Stuart, Iowa.  In the Stuart Motor Lodge parking lot, law enforcement located a vehicle known to be operated by PEREZ III and XINA—a silver 2016 Chevrolet Impala bearing California registration 8GUH133 (registered to XINA's mother)—with a U-Haul trailer attached.

46.     Thereafter, positional data indicates that phones traveled to Rochelle, Illinois, then to Wisconsin. Law enforcement then located the Impala traveling

north on I-43 at the Illinois-Wisconsin border on November 4, 2019, at approximately 4:03 p.m. At a rest stop in Elkhorn, Wisconsin, three adult Hispanic males, one female, and a baby were observed exiting and re-entering the Impala.

47. Once in Milwaukee, law enforcement observed PEREZ III operating and XINA occupying the Impala, which stopped at three Milwaukee residences. Law enforcement observed PEREZ III meet with an unknown male and female in Milwaukee, from whom PEREZ III obtained two boxes that he subsequently placed in the U-Haul trailer. After this meeting, PEREZ III, XINA, and their passengers entered the Impala and left the area. PEREZ III eventually drove to MARY's residence located at 4748 N. 49th Street, Milwaukee, Wisconsin, and backed into her driveway. Law enforcement observed the occupants of the vehicle remove boxes from the trailer, but were unable to determine if the boxes were taken in the residence or the garage because it was late in the day and dark.

48. On November 8, 2019, law enforcement conducted surveillance of PEREZ III with the assistance of court ordered location data associated with the Impala. Law enforcement observed PEREZ III operating the Impala as the sole occupant and park on the north side on West Burnham Street between South 17th Street and South 18th Street in Milwaukee, Wisconsin. Law enforcement observed a grey Audi Q5 SUV, bearing WI registration AEB-5843,[2] turn north onto South

---

[2] According to Wisconsin Department of Transportation records, the WI registration plates attached to the Audi Q5 SUV are not associated with that vehicle.

17th Street, make a U-turn, and park on South 17th Street near the corner of W. Burnham Street.  Case agents observed a Hispanic male, later identified as CARLITO FERREIRA MERCADO, exit his vehicle and walk towards the area of the Impala.  Case agents were unable to observe FERREIRA MERCADO meet with PEREZ III; however, FERREIRA MERCADO was out of his vehicle for less than five minutes before he returned to his Audi SUV and left the area.  Law enforcement observed PEREZ III drive the Impala away from the area by himself. The surveilled interaction between PEREZ III and FERREIRA MERCADO is consistent with a drug transaction.

      **E.**      **SOI #1 Arrested and Admits Supplying PEREZ III with Cocaine.**

    49.    On ▮▮▮▮▮▮▮▮▮▮ a federal search warrant was executed at ▮Redacted▮ ▮Redacted▮, Milwaukee, Wisconsin, the residence of SOI #1.  During the course of the search, agents located the following: $12,000 in U.S. Currency, a rifle with an extended magazine, a pistol, thirteen cellular telephones, a money counter, packaging materials including bags, scales, rubber gloves, and a vacuum sealer, and approximately 500 grams of cocaine.

    50.    Also on ▮▮▮▮▮▮▮▮ SOI #1 was arrested in Milwaukee, Wisconsin on a federal arrest warrant issued in the ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Upon arrest, SOI #1 provided information regarding PEREZ III.

25

51.     SOI #1 identified a photograph of PEREZ III and stated that SOI #1 knows PEREZ III by face and doesn't know his real name. SOI #1 stated that SOI #1 only knows PEREZ III by the nickname of "Grenas." SOI #1 met PEREZ III approximately 1.5 to 2 years before SOI #1's arrest. SOI #1 began supplying kilogram quantities of cocaine to PEREZ III shortly after meeting PEREZ III.

52.     SOI #1 stated that PEREZ III split his time between Milwaukee and California, and SOI #1 did not supply drugs to PEREZ III on a regular basis. According to SOI #1, SOI #1 saw PEREZ III infrequently, and their encounters were for the sole purpose to conduct drug transactions.  SOI #1 stated that PEREZ III was very close with PEREZ III's family members and was not trusting of very many people.  SOI #1 stated that SOI #1's dealings were with only PEREZ III, and PEREZ III never brought anyone with him when obtaining cocaine from SOI #1. PEREZ III told SOI #1 that he preferred to conduct drug transactions himself so that PEREZ III could control the transaction better. SOI #1 did not know any of PEREZ III's customers.

53.     SOI #1 stated that PEREZ III brings approximately 800-1,000 pounds of high-grade marijuana to Milwaukee from California each month for distribution in the Milwaukee area.  PEREZ III also sells "vape pens" containing THC in the Milwaukee area.  PEREZ III told SOI #1 that PEREZ III makes more money selling marijuana than cocaine or heroin.  PEREZ III told SOI #1 that PEREZ III obtained the marijuana from "Asians" in the Sacramento, California area.

26

54.     SOI #1 identified a photograph of PEREZ JR. and stated that PEREZ

JR. transported marijuana and cocaine from California to Milwaukee for PEREZ

III.  SOI #1 further stated that PEREZ III told SOI #1 that PEREZ JR. was

involved in a traffic stop and arrested by the police. PEREZ III was upset and told

SOI #1 that PEREZ III believed that someone "snitched" on PEREZ III resulting in

PEREZ JR. being stopped by the police. SOI #1 did not know what PEREZ JR. had

in the vehicle, but knew that PEREZ JR. had a pending case as a result of the

traffic stop.

55.     SOI #1 stated SOI #1 supplied PEREZ III with approximately 10

kilograms of cocaine per week over the last 1 ½ to two years when PEREZ III was in

Milwaukee, and one kilogram of heroin around February or March of 2019.

According to SOI #1, PEREZ III mainly sold kilogram quantities of cocaine and

large amounts of marijuana.  SOI #1 stated that PEREZ III paid approximately

$30,000 for a kilogram of cocaine and approximately $46,000 for a kilogram of

heroin, and PEREZ III always paid SOI #1 in cash.  PEREZ III told SOI #1 about

obtaining kilograms of methamphetamine, but SOI #1 had no direct knowledge of

PEREZ III selling methamphetamine.

56.     SOI #1 stated that PEREZ III had an additional kilogram level cocaine

source of supply in California and Milwaukee. PEREZ III told SOI #1 that even

though the kilograms of cocaine cost a little more in Milwaukee than they do in

California, it was sometimes easier and less risky for PEREZ III to obtain the

cocaine in Milwaukee. SOI #1 did not know how PEREZ III was getting the cocaine to Milwaukee from California since PEREZ JR. was arrested.

57. According to SOI #1, a few days before SOI #1 was arrested, PEREZ III contacted SOI #1 and requested seven kilograms of cocaine, but SOI #1 did not have any. SOI #1 stated PEREZ III said that he would go to his "other guy," even though PEREZ III liked the quality of SOI #1's cocaine. SOI #1 described himself/herself as the "back up supplier."

58. According to SOI #1, PEREZ III told SOI #1 that PEREZ III had two "stash houses" in Milwaukee, but SOI #1 did not know where those houses were located.

59. SOI #1 further indicated PEREZ III told SOI #1 that PEREZ III had a customer who purchased kilogram quantities of heroin from PEREZ III, but that PEREZ III didn't like selling heroin because PEREZ III said that selling heroin was "dangerous." PEREZ III told SOI #1 that PEREZ III's heroin supplier was in Milwaukee.

60. SOI #1 stated that SOI #1 had a telephone number for PEREZ III in one or more of SOI #1's cellular telephones and that the number would be stored under the name "Grenas." SOI #1 frequently changed telephone numbers so SOI #1 could not say which one of SOI #1's phone had "Grenas'" phone number. SOI #1 recalled mainly texting and calling with PEREZ III and stated that PEREZ III also frequently changed his telephone numbers.

61.     Pursuant to a lawful search of SOI #1's various telephones, case agents located in one of SOI #1's phones a contact name of "Grenas" with the corresponding telephone numbers listed as "Mobile 213-238-1605" and "Home 562-273-8530."

62.     PEREZ III used both of these telephone numbers to communicate with SOI #1 in ▮▮▮▮ which communications, which are believed to be criminal in nature, were intercepted pursuant to a district court order authorizing wire and electronic communications over various phones used by SOI #1 in a case originating in ▮▮▮▮▮▮▮▮

**F.     PEREZ III Ships Parcels Via U.S. Mail From Milwaukee to SANCHEZ in California Using Aliases.**

63.     United States postal records, post office video surveillance, and court ordered location data from a tracking device on PEREZ III's Chevrolet Impala reflect that PEREZ III mailed approximately 14 packages to JULIAN SANCHEZ in California between December 2019 and January 2020, from the U.S. Post Office located at 5500 S. Howell Avenue, Milwaukee, Wisconsin.

64.     The sender names on the packages are "Joe Gonzalez" or "Melany Gonzalez," and the sending addresses vary by the package. One of sending addresses listed was "3238 W. Morgan Ave, Milwaukee, WI 53221," which is a former address for PEREZ III between 2016 and 2017.  Another example of a sending address that was used was "3701 S. Howell Ave, Milwaukee, WI 53207," which corresponds to a Walgreens pharmacy store.

29

65.     The recipient names mostly include JULIAN SANCHEZ, but have also listed Shannon Butler. Some of the destination addresses have been associated with JULIAN SANCHEZ in law enforcement database, and some of the destination addresses have been determined to be third party shipping companies that have mailbox rentals.

66.     Court ordered location data for the Impala reflects that the Impala was stopped in the area of the Howell Avenue post office on dates that correspond to the mailing dates the above-described packages.

67.     Additionally, while video surveillance from the post office was not available on all pertinent dates due to a malfunction, video surveillance depicts PEREZ III at the post office mailing parcels on December 23 and December 24, 2019, and January 27, 2020, which parcels have been identified as the ones mailed to JULIAN SANCHEZ. Additionally, video surveillance from January 27, 2020 also depicted PEREZ III's Impala.

68.     Based on the information set forth supra, PEREZ III uses aliases and false addresses to conceal his identity. Based upon the weight of the packages and intended recipient, I believe that PEREZ III is mailing bulk U.S. currency to JULIAN SANCHEZ to pay for narcotics.

**G.     February 6, 2020, Arrest of Co-conspirator; PEREZ III Dropped His Telephone Numbers.**

69.     On December 18, 2019, case agents met with SOI #2 regarding an ounce-level cocaine supplier in the Milwaukee, Wisconsin, area identified as

30

ANTONIO RODRIGUEZ. SOI #2 stated RODRIGUEZ goes by the street name of "Lil Mexico" and utilizes cellular telephone number (414) 704-8749. SOI #2 stated that RODRIGUEZ works for a larger supplier unknown to SOI #2. SOI #2 stated SOI #2 had recently seen RODRIGUEZ at a gas station on the south side of Milwaukee driving a gray Nissan Maxima. SOI #2 also observed an unknown Hispanic male, described as a larger build individual with long hair with braids, with RODRIGUEZ. Case agents provided SOI #2 with a photograph of PEREZ III, and SOI #2 positively identified PEREZ III as the Hispanic male with RODRIGUEZ. Analysis of pen register data shows that 414-704-8749 was in regular contact with PEREZ III throughout January of 2020.

70.     On February 6, 2020, at approximately 6:30 a.m., RODRIGUEZ was arrested on an outstanding felony arrest warrant for Possession with Intent to Distribute Cocaine and Carrying a Concealed Weapon, and his home located at 2151 S. 18th Street, Milwaukee, Wisconsin, was searched. Law enforcement located the following items during the search: approximately $4,000 in U.S. Currency, two pistols and a rifle, approximately 500 grams of cocaine, three cellular telephones, approximately 20 grams of marijuana, and packaging materials including bags and a vacuum sealer. Two of the cellular telephones were identified with cellular telephone numbers (414) 704-8749 and (414) 232-9041.

71.     During the search and arrest of RODRIGUEZ, a female identified as Anahi Roberto was found to be in the residence with RODRIGUEZ. Roberto stated

31

to case agents that she was RODRIGUEZ' girlfriend and identified her cell phone number as (414) 704-0825.

72.     Based upon the pen register data on PEREZ III's cellular telephones ((336) 837-5892) and (626) 733-2083), on February 6, 2020, the following occurred:

      a.     (336) 837-5892 attempted to contact RODRIGUEZ at (414) 232-9041 twenty times between 7:24 a.m. and 9:10 a.m. via voice call;

      b.     (626) 733-2083 attempted to contact RODRIGUEZ at (414) 232-9041 eight times between 9:14 a.m. and 10:00 a.m., seven of which were voice calls and one was a text message;

      c.     (414) 704-0825 (RODRIGUEZ' girlfriend) contacted (626) 733-2083 at approximately 10:37 a.m. and again at 10:40 a.m. via voice calls.

73.     On that same day—February 6, 2020—PEREZ III changed both of the above-referenced telephone numbers to (310) 213-2750 and (626) 733-6730 (the "6730 Phone"). However, he kept the same cellular devices for both new phone numbers.

74.     Despite the telephone number change on February 6, 2020, on February 11, 2020, one of the new phone numbers ((310) 213-2750) was no longer used to make outgoing calls. Case agents performed a common call analysis using pen/trap data to determine that PEREZ III began using telephone number (414) 499-1861 (the "1861 Phone"). The 1861 Phone is believed to be a replacement phone for (310) 213-2750. The 1861 Phone was activated and first used on February 11, 2020.

32

**H.    Title III Wiretap Authorization and Contemporaneous Surveillance.**

75.    On March 19, 2020, United States District Judge Lynn Adelman issued a court order authorizing the initial interception of wire and electronic communications over the 6730 Phone, used by PEREZ III. Case agents began intercepting wire and electronic communications over the 6730 Phone on March 20, 2020.

76.    Intercepted communications over the 6730 Phone, as well as contemporaneous surveillance of DTO members, has revealed that the DTO uses various criminal associates to receive and retrieve packages delivered by Fed Ex, DHL, and UPS. The Fed Ex and UPS packages are believed to contain controlled substances based upon the way in which PEREZ III distances himself from the packages by measures that include using aliases as the recipient, shipping the packages to multiple Milwaukee locations (identified as DTO associates' residences), carefully tracking the packages, and conducting counter surveillance around the time packages are delivered.

77.    For example, between March 23 and 29, 2020, FedEx and DHL delivered at least 9 separate packages to at least 5 different DTO associated addresses, including the residences of MICHELE HART, PEREZ JR., JOSE ALVARADO, MA YANG, and MERCEDES HERBERT GONZALEZ.

78.    During this investigation, PEREZ III has used and has had access to numerous vehicles registered in his name, XINA's name, and numerous family

33

members of both PEREZ III and XINA. Moreover, since approximately November 2019, case agents have been attempting to track the movement of PEREZ III and XINA through various court-authorized GPS tracking devices on five of their vehicles, which have all been used to facilitate the DTO's operation. PEREZ III continues to change the vehicles he operates on a frequent basis.

79.     Similarly, during this investigation, PEREZ III has used numerous telephone numbers, and has used multiple telephones at the same time. Interceptions over the 6730 Phone have confirmed PEREZ III's current use of multiple phones, including at least one phone number that has yet to be identified.[3] Case agents believe that PEREZ III is using at least one other phone in addition to the 6730 Phone and the 1861 Phone, based on the following:

        a.     On March 21, 2020, case agents intercepted a voice call between PEREZ III and XINA over the 6730 Phone. During this call with XINA over his 6730 Phone, PEREZ III is heard answering another phone call stating "I'mma call you back. I'm right here [U/I] with my lady man." Pen register records for the 1861 Phone do not show an incoming call at the time of interception on the 6730 Phone,

_____

[3] Interceptions over the 6730 Phone have confirmed that PEREZ III is using the 1861 Phone. For example, on March 22, 2020, at 8:46:08 p.m., case agents intercepted a voice call between PEREZ III and an unknown male over the 6730 Phone. During this call, a phone is heard ringing in the background. PEREZ III then states, "Hold on, let me answer this." While on the phone with the unknown male on the 6730 Phone, in the background, PEREZ III is heard saying "Hello?" and "Hey, let me call you back dude." The pen register for the 1861 Phone during this time frame showed an incoming call at 8:46:51 p.m. from a prepaid phone, indicating that PEREZ III is currently using the 1861 Phone. PEREZ III's use of the 1861 Phone has also been confirmed by positional data.

34

indicating that PEREZ III is using at least one other phone in addition to the 6730 Phone and the 1861 Phone.

b.    On March 30, 2020, PEREZ III, using the 6730 Phone, received an incoming call from XINA, using (626) 629-9932. During this conversation, XINA questioned PEREZ III about a telephone number PEREZ III had in his phone for an unknown female.  PEREZ III stated, "Babe I ain't got nothing to hide.  You think if I was hiding something, why would I leave my phone there babe. That be stupid as fuck dawg."  The conversation continues and PEREZ III later states, "I'm saying though, I know, but I'll tell you when I get home but, you got the passes to all my phones.  I leave shit there comfortably, you feel me?"  PEREZ III later states, "Nah, I tell you I got a couple of random calls on both of them."  PEREZ III again stated, "If it was anything, why would I leave my phones there, come on now." Case agents believe based on this conversation that PEREZ III has at least two other phones in addition to the 6730 Phone because he was talking over the 6730 Phone while he referred to "all [his] phones" and asked "why would I leave my phones there."

c.    While conducting surveillance on April 6, 2020, case agents observed PEREZ III talking on a cellular telephone. A call analysis for the 6730 Phone and the 1861 Phone did not reveal any incoming or outgoing calls during or surrounding this observation of PEREZ III using a cellular telephone. Further, the positional data for XINA's current telephone was pinging at a separate and unrelated address, ruling out the possibility that PEREZ III was using XINA's

35

phone. Therefore, case agents believe that PEREZ III is using at least one other cellular device in addition to the 6730 Phone and 1861 Phone.

      d.     Also on April 6, 2020, at approximately 6:00 p.m., PEREZ III was observed on a cellular phone via remote surveillance at PEREZ JR.'s house, 420 East Morgan Avenue in Milwaukee. Once again, a call analysis for the 6730 Phone and the 1861 Phone did not reveal any incoming or outgoing calls during or surrounding this observation of PEREZ III using a cellular telephone, solidifying case agents belief that PEREZ III is using at least three cellular telephones.

      80.    Case agents have conducted extensive physical and remote surveillance on PEREZ III since interceptions of the 6730 Phone began. On several occasions, Fed Ex has delivered packages to various DTO residences, however the pen registers on both the 6730 Phone and the 1861 Phone do not show any activity. Based on their training, experience, and knowledge of this investigation, case agents believe that DTO members are communicating with PEREZ III on an unidentified phone based on the coordinated efforts of DTO members to deliver, retrieve, and transport other packages.

      81.    Based on the interceptions and surveillance in this case, case agents believe that PEREZ III is using at least three cellular devices. Importantly, PEREZ III is observed using an unidentified telephone during and around activities that relate solely to the DTO, i.e., delivery and retrieval of packages from various residences in the City of Milwaukee. Further, based on training and experience, I know that drug traffickers often compartmentalize their use of cellular phones so as

36

to insulate themselves from law enforcement detection as well as to carry on their trafficking activities when and if it becomes necessary to change a singular telephone number. Therefore, case agents are requesting this warrant to identify the telephone numbers used by PEREZ III to further determine the full scope and structure of the DTO.

## MANNER OF EXECUTION

82.    In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication.  These signals include a cellular device's unique identifiers.

83.    To facilitate execution of this warrant, law enforcement may use an investigative device that sends signals to nearby cellular devices, including the Target Cellular Devices, and in reply, the nearby cellular devices will broadcast signals that include their unique identifiers.  The investigative device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell to communicate with others.  Law enforcement will use this investigative device when they have reason to believe that LOUIS PEREZ III is present.  Law enforcement will collect the identifiers emitted by cellular devices in the immediate vicinity of the Target Cellular Devices when the subject is in multiple locations and/or multiple times at a common location and

37

use this information to identify the Target Cellular Devices, as only the Target Cellular Devices' unique identifiers will be present in all or nearly all locations. Once investigators ascertain the identity of the Target Cellular Devices, they will cease using the investigative technique. Because there is probable cause to determine the identity of the Target Cellular Devices, there is probable cause to use the investigative technique described by the warrant to determine the identity of the Target Cellular Devices.

84. The investigative device may interrupt cellular service of cellular devices within its immediate vicinity. Any service disruption will be brief and temporary, and all operations will attempt to limit the interference cellular devices. Once law enforcement has identified the Target Cellular Devices, it will delete all information concerning non-targeted cellular devices. Absent further order of the court, law enforcement will make no investigative use of information concerning non-targeted cellular devices other than distinguishing the Target Cellular Devices from all other devices.

## AUTHORIZATION REQUEST

85. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41. The proposed warrant also will function as a pen register order under 18 U.S.C. § 3123.

86. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 120 days from the end of the period of authorized

38

surveillance. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the person carrying the Target Cellular Devices would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). There is reasonable necessity for the use of the technique described above, for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

87. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to identify the Target Cellular Devices outside of daytime hours.

88. A search warrant may not be legally necessary to compel the investigative technique described herein. Nevertheless, I hereby submit this warrant application out of an abundance of caution.

## ATTACHMENT A

This warrant authorizes the use of the electronic investigative technique described in Attachment B when the officers to whom it is directed have reason to believe that LOUIS PEREZ III is present at certain locations, including, but not limited to:

1653 S. 57th Street, West Allis, Wisconsin

2100 W. Pierce Street, Milwaukee, Wisconsin

420 E. Morgan Avenue, Milwaukee, Wisconsin

1

## ATTACHMENT B

The "Target Cellular Devices" are the cellular device or devices carried by LOUIS PEREZ III. Pursuant to an investigation of LOUIS PEREZ III for a violation of 21 U.S.C. §§ 841(a)(l) and 846 (distribution of controlled substances and conspiracy to distribute controlled substances); 21 U.S.C. § 843(b) (unlawful use of communications facilities); and 18 U.S.C. §§ 1956 and 1957 (laundering of monetary instruments and conspiracy to do so), this warrant authorizes the officers to whom it is directed to identify the Target Cellular Devices by collecting radio signals, including the unique identifiers, emitted by the Target Cellular Devices and other cellular devices in its vicinity for a period of thirty days, during all times of day and night.

Absent further order of a court, law enforcement will make no affirmative investigative use of any identifiers collected from cellular devices other than the Target Cellular Devices, except to identify the Target Cellular Devices and distinguish them from the other cellular devices. Once investigators ascertain the identity of the Target Cellular Devices, they will end the collection, and any information collected concerning cellular devices other than the Target Cellular Devices will be deleted.

This warrant does not authorize the interception of any telephone calls, text messages, or other electronic communications, and this warrant prohibits the seizure of any tangible property. The Court finds reasonable necessity for the use of the technique authorized above. See 18 U.S.C. § 3103a(b)(2).

1